(50 South. 704.)

No. 17,501.

### UNION FERRY CO. v. SOUTHERN IMPROVEMENT & FERRY CO.

(Oct. 18, 1909. Rehearing Denied Nov. 29, 1909.)

1. CONTRACTS (§ 162*)—CONSTRUCTION OF CONFLICTING SENTENCES.

Where, in a stipulation contained in a contract, there are two sentences which in some respects appear to conflict, they should be construed together and with reference to the stipulation as a whole, and that interpretation should be placed on them which does least violence to the rules and presumptions which are ordinarily applied with respect to conduct of individuals dealing with each other.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 744; Dec. Dig. § 162.*]

2. CONTRACTS (§ 162*)—CONSTRUCTION — CONFLICTING SENTENCES—LEASE.

The city of New Orleans having bound itself to provide for the payment to the retiring lessee of the Canal Street ferry for certain improvements, and having made a new lease containing a stipulation that the new lessee should indemnify the retiring lessee in accordance with the terms of his lease, a subsequent sentence in the same stipulation, specifying certain things to be paid for, is held not to impose upon the new lessee the obligation of paying the retiring lessee for a sidewalk and pavement laid in a public place, and not included among those things for which the retiring lessee was entitled to be paid under his lease.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 744; Dec. Dig. § 162.*]

(Syllabus by the Court.)

Appeal from Civil District Court, Parish of Orleans; George H. Théard, Judge.

Action by the Union Ferry Company against the Southern Improvement & Ferry Company. Judgment for plaintiff, and defendant appeals. Reversed and rendered.

James C. Henriques, for appellant. Frank E. Rainold, for appellee.

### Statement of the Case.

MONROE, J. Plaintiff sues for the recovery of the sum of $4,350, alleged to be due by defendant as the value of a certain Shillinger (or artificial stone) sidewalk, extending from the depot of the Louisville & Nashville Railroad Company to the Canal Street ferry landing, and certain square block paving, adjacent to the ferry house at said landing, under a contract whereby defendant acquired from the city of New Orleans the franchise of the Canal Street ferry for a period of 15 years from January 1, 1907. The defense is, in substance, that no obligation to pay for said sidewalk and paving is imposed upon defendant by the contract relied on.

It appears that Thomas Pickles was the lessee of the Canal Street ferry for a term of 10 years, ending December 31, 1886, and that the lease was again adjudicated to him for a like term ending December 31, 1896, under an ordinance which contained the following, among other, provisions, to wit:

"Art. 10. That the lessee or his assigns shall pave, within nine months after the promulgation of this ordinance, with square granite block paving, the prolongation of Canal Street from the present pavement of the depot of the Louisville & Nashville Railroad to the ferry landing, the width (including pathways) to be not less than 30 feet, and all of which to be done according to plans and specifications to be furnished by the city surveyor; the said lessee, or his assigns, also binding himself to keep said pavement in perfect repair during the continuance of this privilege.

"Art. 11. That said Thomas Pickles, his successors and assigns, shall and will, on the last day of the term of his present leases, respectively, or of the additional time or lease hereby granted, peaceably and quietly, leave, surrender and yield up the said ferries and the premises and the ferry property and boats, respectively, with the rights, privileges and appurtenances thereto belonging, with the bulkheads, piers, docks, floats, bridges and other fixtures and improvements which may have been erected for the use of said ferries, in good order and condition, into the possession of said city, its successors or assigns, without delay; and said city does, for itself, its successors and assigns, covenant and agree to and with said Pickles, his successors and assigns, and upon the surrender and yielding up of said premises, as hereinbefore provided, said city shall purchase, or cause to be purchased by the next lessee or lessees, of said Pickles, his successors or assigns, at a fair appraised valuation, the boats, buildings and improvements, wharves, docks, bridges and floats, and other property of said Pickles, his successors or assigns, used upon, or for, said ferries, respectively, and actually necessary for the purposes of said respective ferries, said valuation to be fixed by two appraisers, one to be appointed by said Pickles and one by the city, or the

next lessee or lessees; and, in case of disagreement of said two appraisers, they, said appraisers, shall appoint an umpire, who shall decide between them; and the provisions and rights in this section set out, stipulated, or granted shall be substituted and taken as repealing, annulling and avoiding all conditions, terms and stipulations in the said existing leases, or contained in any ordinance or resolution of the city council on the subject-matter of the destination or disposition of the improvements, boats, buildings, wharves, bridges, floats and property of said Pickles, his assigns and successors, connected with said ferries, or any of them."

During the term of the lease under this ordinance, to wit, in 1892, the city passed an ordinance (No. 6,610, C. S.), which, after various recitals, proceeds as follows:

"That permission is hereby granted to Capt. Thomas Pickles to move, at his own expense, the ferry landing from its present position to the prolongation of the north side of Canal street, using the same ground at this point as the present ferry lease embraces. * * * That the said Thomas Pickles, his heirs or assigns, shall make this change at once, * * * and that he shall, at his own expense, construct a new, two-story, ferry house, * * * and take up the present paved roadway leading to the ferry, and lay it between the new ferry landing and the roadway built by the wharf lessees at the head of Canal street, * * * and that the said Thomas Pickles shall also, in addition to the above, remove the present banquette, leading to the present ferry landing, and shall make a banquette, 18 feet wide, on the prolongation of the north side of Canal street, all the way from the depot of the Louisville & Nashville Railroad to the said ferry house, the banquette to be paved, throughout its entire length, with Shillinger. * * * That the entire expense of the improvement proposed shall be paid by the lessee of the Canal Street ferry."

The city engineer, under date May 18, 1893, certified that, with certain exceptions, the work required by the ordinance thus quoted had been done; his certificate, so far as the paving and banquetting were concerned, reading as follows:

"The old roadway leading to the ferry landing has been removed, and the stone from this portion relaid in front of the ferry house, according to the directions of this department. There has been laid in front of the new ferry house more pavement than was contained in the old roadway. There has been laid a Shillinger banquette. 18 feet wide, from the Louisville & Nashville Railroad depot to the rock road on the levee, with a substantial curbing on either side, all according to the direction of this department."

Some time before the expiration of the lease last above mentioned the ferry privilege was again adjudicated to Capt. Pickles for a term of ten years, ending December 31, 1906, and a lease was entered into which contained the following stipulation, viz.:

"The purchaser of this franchise shall, on the last day of this lease, or at the termination of any extended time, peaceably leave, surrender and yield the said ferries, as also the ferry property and boats and improvements, with all the rights, privileges and appurtenances thereto belonging, and other fixtures and improvements which may have been erected for the use of said ferries and the proper maintaining of same in good order and condition, into the possession of the city of New Orleans, or to such party or parties to whom may be adjudicated the privilege of continuing the ferries; shall purchase all betterments and improvements, wharves, docks, floats, pavements, ferry houses and other property of the retiring lessee, which was used upon and for ferries and actually necessary for the purpose of operating said ferries, at a fair appraised valuation, to be fixed by two appraisers, one to be appointed by the said lessee and one to be appointed by the lessor. In case of disagreement of said two appraisers, the said appraisers shall appoint an umpire, who shall decide between them, and the finding of the majority of said board of appraisers shall be binding."

At some time prior to the expiration of the lease thus referred to, Capt. Pickles died, and the defendant now before the court became the assignee of the lease, and at a later date, in view of its prospective expiration, the city advertised a new lease, to begin January 1, 1907; the advertisement containing the following stipulation, which, defendant having become the lessee, was incorporated in, and forms part of, the contract under which it (defendant) now operates the ferry, to wit:

"The purchaser shall purchase from the Union Ferry Company all such property and improvements as are now in use for the purpose of operating such ferry system, and shall indemnify said company, in accordance with the terms of the lease between the city of New Orleans and Thomas Pickles and his assigns, the Union Ferry Company, at a valuation to be fixed by the appraisers, as provided for in the existing lease. Said appraisers shall be appointed immediately after the acceptance of the bid by the leasing corporation, and they shall complete their appraisement within five (5) days,

and the accepted bidder shall pay, in cash, to the Union Ferry Company the valuation fixed by said appraisers upon the boats, buildings, landings, approaches, improvements, docks, bridges, gangways, piling, pontoons, pavements, and all other improvements and betterments constructed by said Thomas Pickles, or his assigns, the Union Ferry Company.

" 'This cash payment to be made upon delivery by the Union Ferry Company to said accepted purchaser, and said accepted purchaser shall not be entitled to said delivery until he shall have made said cash payment, and not until the expiration of the present lease—viz., December 31, 1906.' "

An appraisement was made, in accordance with the foregoing stipulation, and thereafter, by notarial contract, the Union Ferry Company sold to defendant the following described property, to wit:

"(1) The · steam ferryboat Thomas Pickles, her tackle and apparel. ·

"(2) The steam ferryboat A. M. Halliday, her tackle and apparel.

"(3) The steam ferryboat Josie, her tackle and apparel. * * *

"(4) The Canal Street ferry house, situated at the head of Canal street, with the wagon and passenger gangways, the Canal Street ferry landings, pilings, and bulkheads, pontoon, and all the appurtenances of said bridges and landings.

"(5) The Algiers ferry house, situated at the head of Morgan street, or thereabouts, together with the wagon and passenger gangways, pilings, and pontoons, the betterment of the batture, including the pavement, and the two ramps connected with said ferry landings, all appurtenances of the wagon and passenger gangways of both ferry landings, including the hoists, screws, and chains are included in this sale."

The consideration of the sale of the property described was $109,000 cash, and the act of sale contains the following recitals and agreements concerning the property thus described and sold and that here in dispute, to wit:

"This sale includes everything contained in detail list, excepting the pavement on Canal street side, which list was signed by Warren Johnson, umpire, and dated 31st December, 1906, a copy whereof, duly paraphed by me, notary, is annexed for reference. This sale does not, however, include pavement and curbing on Canal street side, which are made the subject of further stipulation hereafter. * * *

"The appraisement of the Canal Street ferry property embraces, besides the property con-

nected with the Canal Street ferry system, included in this sale, the following described pavements, to wit:

"(1) The cement walk, reaching from the Louisville & Nashville depot to the ferry house at the head of Canal street.

"(2) The granite block pavement in front of said ferry house and the pavement leading from the Louisville & Nashville depot, parallel with the cement walk, and the curbing now existing in connection with the curbing and the said walk.

"The appraisement of said pavement, as made by said board of appraisers, is the sum of $4,-350. Now, whereas, it is contended by the Union Ferry Company that the Southern Improvement & Ferry Company is under obligation to purchase said pavements from the Union Ferry Company under the terms of the contracts under which the Union Ferry Company now holds as owner and under the terms of the contract between the city of New Orleans and the Southern Improvement & Ferry Company; * * * and whereas, the Southern Improvement & Ferry Company contends that it is under no obligation whatsoever to purchase said pavements: Therefore it is agreed between the parties that the amount of the appraised value of said pavements, viz., the sum of $4,-350, shall be deposited in the Commercial Germania Trust & Savings Bank, or any other bank paying interest, there to remain until the question between the said parties can be determined by judicial proceedings, neither party to this contract waiving any of its rights by virtue of this agreement."

There was some little oral testimony adduced, from which it appears that the Shillinger "banquette" here in question is, in effect, a continuation of the banquette of Canal street, across the levee (which is a public landing) to the river, or, rather, to that portion of the levee, on the river bank. which is adjacent to the ferry house, and which is covered with the square block pavement, also in controversy.

### Opinion.

If the stipulation in the present lease between the city of New Orleans and defendant in unambiguous terms required defendant to pay plaintiff for the sidewalk and pavement here in dispute, it might very well be argued (as, in fact, it is argued) that it is a matter of no concern to defendant whether or not the city was bound, under the preced-

ing lease, to provide for such payment. But, whatever may be the first impression, a careful consideration of the language used in the stipulation in question excites a serious doubt whether it was the intention that the city should make any further provision with respect to the reimbursement of the preceding lessee than was absolutely demanded by the terms of the preceding lease.

The stipulation (in so far as it bears upon the question at issue) is composed of two sentences, the first of which reads:

"The purchaser shall purchase from the Union Ferry Company all such property and improvements as are now in use for the purpose of operating such ferry system, and shall indemnify said company, in accordance with the terms of the lease between the city of New Orleans and Thomas Pickles, and his assigns, the Union Ferry Company, at a valuation to be fixed by the appraisers, as provided for in the existing lease."

This sentence, according to our understanding of the language, means that the purchaser of the new lease is to purchase the property belonging to the old lessee and used for the purpose of operating the ferry, and that he shall indemnify the old lessee in accordance with the terms of the then existing lease. The remaining sentence reads:

"Said appraisers shall be appointed immediately after the acceptance of the bid by the leasing corporation, and they shall complete their appraisement within five days, and the accepted bidder shall pay, in cash, to the Union Ferry Company the valuation fixed by said appraisers upon the boats, buildings, landings, approaches, improvements, docks, bridges, gangways, pilings, pontoons, pavements and all other improvements and betterments constructed by said Thomas Pickles, or his assigns, the Union Ferry Company."

Considering this sentence merely as part of the lease, but without reference to the sentence which precedes it, and it appears to us to mean that the "purchaser" (defendant) is to pay to the Union Ferry Company the valuation placed by the appraisers upon the different items specified, including improvements which had been constructed by the preceding lessee, in his capacity as such, for the use or improvement of the ferry; and this, whether such payment was provided for by the preceding lease or not, with the exception, however, that we do not think it can, reasonably, be held to include any work or improvements of which the city may have become the absolute owner, under a contract with Pickles antedating the preceding lease and not made in connection therewith for the purposes thereof.

But the first and second sentences are parts of the same stipulation, in the same contract, and, in order to arrive at the meaning of the stipulation as a whole, we must consider the sentences together, and in their relation to the contract. Bearing this in mind, we are bound to assume that the city was aware of the fact that there would, necessarily, be deducted from the price, inuring to it from the sale of the new lease, whatever amount might be due to the lessee under the then existing lease and according to the terms of that contract. We are also bound to assume that the city knew that it was under no obligation to sell the new lease on terms which would diminish the proportion of the price inuring to it beyond the requirements of the then existing lease; in other words, that it was not called on to provide for the payment, to the retiring lessee, from the price of the new lease, of anything more than his contract called for, and that, just in proportion as such provision might be made, the amount inuring to it would be reduced. We then ask ourselves the question whether, after distinctly providing, in the first sentence of the stipulation now under consideration, that the retiring lessee should be paid, according to his contract, it was the intention, by the second sentence, to make provision for a further payment, thereby making him a donation of an amount which, in the end is deducted from that which the city would otherwise receive? And we are constrained to an-

swer the question in the negative, and to hold that the specification contained in the second sentence of the stipulation must be construed with reference to the general limitation contained in the first sentence, whereby the retiring lessee is to be paid for his property and improvements in accordance with the terms of his contract, and not otherwise. Referring to that contract, we find that it was therein provided that the purchaser of the succeeding lease should purchase all betterments and improvements, wharves, docks, floats, pavements, ferry houses, and other property of the retiring lessee which were used upon and for ferries, and actually necessary for the purpose of operating such ferries, and the question is whether, under such provision, the city was bound to provide for the reimbursement of the cost of the sidewalk and pavement here in question, which had been laid under pre-existing contracts and before the then existing lease was entered into. It is true that they were laid by Capt. Pickles, the holder of the then existing lease; but they were not laid under that lease, and it does not follow that, because he laid them (under other contracts) they thereby became "his property," or that they were "actually necessary for the purpose of operating said ferries."

The fact that, under his lease, he was entitled to be paid for such improvements as were his property and were used upon and for ferries, and actually necessary for the purposes of operating said ferries, carries with it the limitation that he was not entitled to be paid for improvements which were not his property, were not used upon and for the ferry, and were not actually necessary for the operation of the same.

It would be a very unusual situation which would authorize the maintenance of the view that a sidewalk or pavement, laid in a public street or place, under a contract

with a municipality, remained, under any circumstances, the property of the contractor by whom laid, and we do not find the situation resulting from the original lease to Pickles (beginning in 1886) and from the modification of that lease, as authorized by Ordinance 6,610, C. S. (of August, 1892), to be of that character. Under the original lease, Pickles was required to pave "the prolongation of Canal street, from the * * * depot to the ferry landing, the width (including pathways) to be not less than 30 feet"; and it is to be presumed that he did so. And it was provided that, upon the surrender of the ferry at the expiration of the lease, the city should purchase, or cause to be purchased, "the boats, buildings and improvements, wharves, docks, bridges, and floats, and other property of said Pickles, * * * used upon and for said ferries, respectively" (he being the lessee of several ferries), "and actually necessary for the purpose of said ferries."

Under Ordinance 6,610, C. S., "permission" was given to the lessee to remove the ferry landing from the position then occupied by it "to the prolongation of the north side of Canal street." And in that connection it was provided:

"That the said Thomas Pickles * * * shall, at his own expense, construct a new, two-story ferry house * * * and take up the present paved roadway, leading to the ferry, and lay it between the new ferry landing and the roadway being built by the wharf lessee at the head of Canal street, or the prolongation on the north side of Canal street, and that the said Thomas Pickles shall also * * * remove the present banquette, leading to the present ferry landing, and shall make a banquette, 18 feet wide, on the prolongation of the north side of Canal street, all the way from the depot * * * to the said ferry house; * * * that the entire expense shall be paid by the lessee of the Canal Street ferry."

Neither the lease nor the ordinance, as it seems to us, contemplated that the pavement and banquette required to be laid should be regarded as thereafter belonging to Capt. Pickles; nor can it be said that ei-

ther of them was, or is, actually necessary for the operation of the ferry. The distance from the depot to the ferry house is said to be some 400 feet, and the paving (other than that of the sidewalk) is adjacent to the ferry house. The sidewalk, no doubt, affords a more convenient way whereby pedestrians can reach the ferry than did the dirt, or shelled, surface of the levee or landing, and the pavement, about the ferry house, no doubt, affords a more stable resting place for horses and vehicles; but the ferry can be, and, up to the time when the sidewalk and pavement were laid, was, operated without the aid of either, and there are many ferries, the approaches to and surroundings of which are not paved with either Shillinger or square granite blocks. Our conclusion, therefore, is that the sidewalk and pavement here in question, not having been the property of plaintiff's assignor and not being necessary to the operation of the ferry, were not among those things for which it was intended that he should be paid upon the expiration of his lease, and hence that they are not included among the things for which plaintiff is entitled to be paid under the lease which last expired.

It is accordingly ordered, adjudged, and decreed that the judgment appealed from be annulled, avoided, and reversed, and that there now be judgment rejecting plaintiff's demand and dismissing this suit, at its costs.