**GULF FEDERAL SAVINGS AND LOAN ASSOCIATION OF JEFFERSON PARISH, Petitioner,**

v.

**FEDERAL HOME LOAN BANK BOARD, Respondent.**

No. 78–2549.

United States Court of Appeals, Fifth Circuit.

July 15, 1981.

As Modified on Denial of Rehearing and Rehearing En Banc Nov. 5, 1981.

Mmahat, Gagliano, Duffy & Giordano, John A. Mmahat, Metairie, La., for petitioner.

Robert E. Jeffers, Jr., Voelker and Jeffers, New Orleans, La., for Stanley Lowe et al., amicus curiae.

Camille F. Gravel, Jr., David W. Robertson, Gravel, Robertson and Brady, Alexandria, La., for State of La. through Joint Legislative Com'n of Intergovernmental Relations, amicus curiae.

Herve Racivitch, Racivitch, Carriere, Panzeca and Charbonnet, New Orleans, La., for League of Sav. and Loan-Homestead Associations of Metropolitan New Orleans, Inc., amicus curiae.

Norris S. L. Williams, Chaffe, McCall, Phillips, Toler and Sarpy, New Orleans, La., for Bishop Childrens Trust et al., amicus curiae.

Harold L. Levi, Asst. Gen. Counsel, Federal Home Loan Bank Bd., Harvey Simon, Asst. Gen. Counsel, Harold B. Shore, Matthew G. Ash, Washington, D. C., for Federal Home Loan Bank Bd.

Before CHARLES CLARK, TJOFLAT and GARZA, Circuit Judges.

**CHARLES CLARK, Circuit Judge:**

Gulf Federal Savings and Loan Association petitions for review of an order by the Federal Home Loan Bank Board, claiming that the Board used its cease and desist authority improperly, in an attempt to enter the consumer protection field. Because we find no statutory authority for the cease and desist order, we grant the petition for review and reverse the Board's decision.

## I.

Gulf Federal was chartered as a federal savings and loan association on May 20, 1965. The first meeting of the Board of Directors was held on June 11, 1965. At that meeting, the Board of Directors resolved that "[i]nterest shall be calculated by use of 360 day interest tables with interest charged for each day in the month." This method of calculating interest is known as the "banker's rule," and is in common use in the New Orleans area. It results in higher interest payments to the lender because the interest rate is computed as though there were 360 days in the year but is charged to borrowers for 365 days. Actual interest paid is thus 365/360 of the nominal interest rate, or 5/360 more than the rate charged under a day-for-day, or 365/365, interest calculation. On a loan with a nominal interest rate of 8 percent, the 365/360 method results in an actual interest rate of approximately 8.11 percent. Nevertheless, all parties agree that the 365/360 method is a legitimate means of calculating interest, and the Bank Board does not challenge Gulf Federal's right to choose to calculate interest in this way.

From June 11, 1965, to June 10, 1969, all Gulf Federal loan agreements contained the following provision:

> All interest is to be calculated monthly by use of the three hundred and sixty day interest tables, and charged for each day of the month, on any balance of the principal sum remaining due and unpaid.

This provision established the 365/360 method as the means for calculating interest in these contracts. On June 10, 1969, however, the Board of Directors unanimously adopted a motion "that the method of calculating Interest on the 360 day factor be changed to the 365 day basis." Gulf Federal loan officers implemented this change immediately by deleting language from the printed loan agreement forms and substituting typed language in its place. The new language stated, "[a]ll interest is to be calculated monthly on the basis of a 365 day calendar year and charged for each day in the month." [1] Gulf Federal has argued before the Board and this court that this provision is ambiguous. The Board rejected these arguments. So do we. It plainly calls for use of the 365/365 method. In actual practice the provision was ignored and interest calculations continued to be made on the 365/360 banker's rule basis.

On October 14, 1969, the Board of Directors passed a motion that amended the June 10, 1969, motion to state that "the method of calculating interest on loans [is] to be done by the 360 day factor on a calendar year basis." This resolution effectively repealed the June 10 resolution and reinstated the 365/360 method of calculating interest. Nevertheless, until February 14, 1973, Gulf Federal loan officers continued using loan agreement forms which contained a provision calling for use of the 365/365 method, and for more than three years provisions in the loan contract forms used by Gulf Federal were at odds with the prevailing resolution by its Board of Directors.

The various Board of Directors resolutions and loan agreement provisions apparently had no effect on the day-to-day course of Gulf Federal's affairs. Gulf Federal never calculated interest on its loans under

---

1. Some of the typewritten provisions reflect apparently inadvertent deviations from the language of the new provision. Thus, in one loan agreement the word "year" was omitted from the phrase "calendar year." The Bank Board also suggests that in one case a loan officer crossed out the old language but failed to type in the new provision. In general, however, it appears that these variations resulted from confusion, and that Gulf Federal attempted to insert the new provision on a uniform basis.

the 365/365 method, regardless of the prevailing resolution of the Board of Directors or any agreement provision to the contrary. From June 10, 1969, to February 14, 1973, as at all other times, the 365/360 method was used to calculate the amount of interest paid.

Each of the loan agreements entered into during the June 10, 1969, to February 14, 1973, period prominently stated (1) the principal sum of the loan, expressed in dollars, (2) the interest rate to be charged on the loan, expressed as a percentage of principal, and (3) an exact monthly payment, expressed in dollars and calculated according to the 365/360 method. Gulf Federal received monthly payments from each of its borrowers in the amounts specified on the face of their respective loan agreements. All of these amounts were determined on the 365/360 basis.

Of the more than 400 Gulf Federal borrowers whose contracts made during this period contained one of the provisions calling for interest to be calculated on a basis inconsistent with the monthly payment shown and charged, only one noticed the discrepancy. No borrower threatened to sue Gulf Federal, and most either signed or were willing to sign agreements amending the original contract and approving use of the 365/360 method.[2] Nevertheless, upon learning of the situation, the Bank Board instituted cease and desist proceedings against Gulf Federal. After a hearing before an administrative law judge, the full Board issued opinions and a cease and desist order directing Gulf Federal to calculate interest under the 365/365 method described in its loan agreements, and to reimburse borrowers for the difference in all payments made under the 365/360 method. That order is the subject of today's appeal.

## II.

Gulf Federal asserts that the cease and desist order is unrelated to the Board's traditional sphere of activity. According to Gulf Federal, the Board's function is to assure the financial stability of savings and loan associations, not to protect consumers from practices considered by the Board to be unfair. The Board responds that it has "cradle to grave" authority in regulating federal savings and loan associations, and that the order is a proper exercise of its statutory obligation.

The Board was created by the Federal Home Loan Bank Act of 1932, 12 U.S.C. § 1437(a) (1957), to establish and supervise a national system of federal home loan banks, including federal savings and loan associations. A major duty of the Board is to protect the government's interest as an insurer of deposits in federally chartered savings and loan associations. Thus, the Board is empowered to expel an association from the federal savings and loan system, and to cancel its federal insurance, when the association is insolvent, is imprudently managed, or otherwise threatens to implicate the government's insurance liability. *See id.*, § 1426(i). The Home Owners' Loan Act of 1933 (HOLA), *as amended*, 12 U.S.C. § 1461 *et seq.*, (1980), authorized the Board to issue and enforce regulations governing the management of federal savings and loan associations. *See* 12 U.S.C. § 1464(c)(1). By use of these powers, the Board was to guarantee the existence of a national system of stable home financing institutions.

The Board's authority to issue cease and desist orders was added to the HOLA by the Financial Institutions Supervisory Act of 1966, Pub.L.No. 89–695, 80 Stat. 1028. The purpose of the amendment was to enhance the Board's ability to promote financial stability among federally chartered savings and loan institutions. *See generally* Note, The Financial Institutions Supervisory Act of 1966, 8 B.C.Ind. & Com.L.Rev. 599, 600–06 (1967). Prior to 1966, the Board's only sanctions against recalcitrant savings and loans were its section 1426(i) power to expel an association from the fed-

---

**2.** Gulf Federal executed such agreements with some 40 percent of its borrowers. The effort to correct the loan agreements ended, however, when the Board began proceedings against the association.

eral savings and loan program, and its authority to take the association into federal custody. *Id.* at 603; S.Rep.No. 1482, 89th Cong., 2d Sess., [1966] U.S.Code Cong. & Ad.News 3532, 3527. These draconian measures, while justified in cases of egregious mismanagement, were considered too harsh to be effective against most savings and loan mismanagement. *See* S.Rep.No. 1482, *supra*, at 3536. Cease and desist authority was added as an intermediate sanction, to permit the Board to correct imprudent management without casting out the offending institution. *Id.* at 3537–38; *see also* ABA Comm. on Savings and Loan Associations, Handbook of Savings and Loan Law 58 (1973); 112 Cong.Rec. 2483–84 (1966) (remarks of Rep. Patman).

The Board's cease and desist authority is now codified at 12 U.S.C. section 1464(d)(2)(A). Under this section, the Board may issue cease and desist orders whenever it determines that an association is engaging "in an unsafe or unsound practice in conducting the business of such asso-

ciation, or is violating or has violated . . . a law, rule, or regulation."[3] The Board found that its order against Gulf Federal was authorized on both grounds. Neither ground, however, has enjoyed authoritative judicial attention. Thus, we must define the boundaries of the Board's cease and desist authority. Defining the limits of such powers requires judicial, not administrative, expertise. For this reason, the Board's call for deference to agency expertise is misplaced.

### III.

The Board found that Gulf Federal's practice "of entering into contracts and, thereafter, breaching them" was an "unsafe or unsound" practice within the meaning of section 1464(d)(2)(A). Even if the Board's premise is correct, the legislative history of the section belies its conclusion, and we reverse this part of the Board's holding.

The "unsafe or unsound practice" provision was the subject of lively congressional

**3.** The full text of section 1464(d)(2)(A) is as follows:

If, in the opinion of the Board, any association or any director, officer, employee, agent, or other person participating in the conduct of the affairs of such association is engaging or has engaged, or the Board has reasonable cause to believe that the association or any director, officer, employee, agent, or other person participating in the conduct of the affairs of such association is about to engage, in an unsafe or unsound practice in conducting the business of such association, or is violating or has violated or the Board has reasonable cause to believe that the association or any director, officer, employee, agent, or other person participating in the conduct of the affairs of such association is about to violate, a law, rule, or regulation, or charter, or any condition imposed in writing by the Board in connection with the granting of any application or other request by the association or any written agreement entered into with the Board, the Board may issue and serve upon the association or such director, officer, employee, agent, or other person a notice of charges in respect thereof. The notice shall contain a statement of the facts constituting the alleged violation or violations or the unsafe or unsound practice or practices, and shall fix a time and place at which a hearing will be held to determine whether an order to cease and desist there-

from should issue against the association or the director, officer, employee, agent, or other person participating in the conduct of the affairs of such association. Such hearing shall be fixed for a date not earlier than thirty days nor later than sixty days after service of such notice unless an earlier or a later date is set by the Board at the request of any party so served. Unless the party or parties so served shall appear at the hearing by a duly authorized representative, they shall be deemed to have consented to the issuance of the cease-and-desist order. In the event of such consent, or if upon the record made at any such hearing, the Board shall find that any violation or unsafe or unsound practice specified in the notice of charges has been established, the Board may issue and serve upon the association or the director, officer, employee, agent, or other person participating in the conduct of the affairs of such association an order to cease and desist from any such violation or practice. Such order may, by provisions which may be mandatory or otherwise, require the association or its directors, officers, employees, agents, and other persons participating in the conduct of the affairs of such association to cease and desist from the same, and, further, to take affirmative action to correct the conditions resulting from any such violation or practice.

concern at the time section 1464(d)(2)(A) was enacted. Several congressmen expressed the view that the "unsafe or unsound practice" formula was too broad and delegated unlimited authority to the Board. *See, e. g.,* 112 Cong.Rec. 25008 (1966) (remarks of Rep. Holifield). The Senate report on the bill noted that the committee had tried to balance the Board's need for flexibility in enforcement against the public's desire to be free of undue federal interference. *See* S.Rep.No. 1482, *supra,* at 3534–35. Representative Patman, the committee chairman and sponsor of the House bill, recognized these fears and admitted that the House committee had been concerned over possible agency abuse of the "unsafe or unsound" provision. 112 Cong. Rec. 24984 (1966) (remarks of Rep. Patman). He nevertheless assured his fellow legislators that "[w]e of the committee are of the opinion that these terms are sufficiently exact and do not involve an overly broad delegation of power to administrative agencies." *Id.*

■ The breadth of the "unsafe or unsound practice" formula is restricted by its limitation to practices with a reasonably direct effect on an association's financial soundness. As Representative Patman pointed out during the House debate,

> [o]f course, it should be clear to all that the cease-and-desist powers and management removal powers are aimed specifically at actions impairing the safety or soundness of our insured financial institutions. These new flexible tools relate strictly to the insurance risk and to assure [*sic*] the public sound banking facilities.

112 Cong.Rec. 24984. The authoritative definition of an unsafe or unsound practice, adopted in both Houses, was a memorandum submitted by John Horne, then chairman of the Bank Board. *See* 112 Cong.Rec. 24984 (1966) (remarks of Rep. Patman) (Horne memorandum authoritative in House); *id.* at 26474 (remarks of Sen. Rob-

ertson) (Horne memorandum included in record in Senate). Chairman Horne defined the provision in the following way:

> Generally speaking, an "unsafe or unsound practice" embraces any action, or lack of action, which is contrary to generally accepted standards of prudent operation, the possible consequences of which, if continued, would be abnormal risk or loss or damage to an institution, its shareholders, or the agencies administering the insurance funds.

112 Cong.Rec. 26474 (1966). Chairman Horne listed several practices that fell within his definition. The examples included such management defalcations as paying excessive dividends, disregarding a borrower's ability to repay, careless control of expenses, excessive advertising, and inadequate liquidity *Id.*

■ The Board found that Gulf Federal's use of the inconsistent contract terms was an unsafe or unsound practice because it threatened "abnormal risk or loss or damage" to the association. However, the only risks the Board has identified are Gulf Federal's potential liability to repay overcharged interest, and an undifferentiated "loss of public confidence" in the bona fides of Gulf Federal's operations. Such potential "risks" bear only the most remote relationship to Gulf Federal's financial integrity and the government's insurance risk. They are qualitatively different from the risks Chairman Horne called to the attention of the 89th Congress. While the potential liability for repayment of the difference in interest charges could lead to a minor financial loss for Gulf Federal,[4] the Board's order would consummate this "risk" immediately by forcing Gulf Federal to repay the interest forthwith, whether or not it is owed. We fail to see how the Board can safeguard Gulf Federal's finances by making definite and immediate an injury which is, at worst, contingent and remote.

Approving intervention under the Board's "loss of public confidence" rationale would

---

4. The estimated "overcharges" total approximately $80,000. In 1979, Gulf Federal had assets of approximately $75 million.

result in open-ended supervision. The loss of confidence identified by the Board is unlike the loss of confidence which engendered the bank failures of the 1930's. The Board's rationale would permit it to decide, not that the public has lost confidence in Gulf Federal's financial soundness, but that the public may lose confidence in the fairness of the association's contracts with its customers. If the Board can act to enforce the public's standard of fairness in interpreting contracts, the Board becomes the monitor of every activity of the association in its role of proctor for public opinion. This departs entirely from the congressional concept of acting to preserve the financial integrity of its members. We decline to adopt the Board's construction of section 1464(d)(2)(A). We limit the "unsafe or unsound practice" provision to an association's financial condition. It does not authorize the Board's cease and desist order against Gulf Federal.

### IV.

Section 1464(d)(2)(A) also permits the Board to issue cease and desist orders when a savings and loan association "is violating or has violated . . . a law." Neither the statute nor the legislative history explain which laws, when violated, give rise to the Board's cease and desist power. The Board, however, has suggested several potential "laws" within the meaning of section 1464(d)(2)(A). Because we find that none of the laws suggested by the Board were violated, we hold that the cease and desist power may not be based on this provision.[5]

### A. *The Bank Act*

■ The Board's first argument is that Gulf Federal has violated the Bank Act, *as amended*, 12 U.S.C. § 1421 *et seq.* (1957). Section 1424(a) of the Act provides that

[n]o institution shall be eligible to become a member of [the federal savings and loan system] if, in the judgment of the board its financial condition is such that

advances may not safely be made to such institution or the character of its management or its home-financing policy is inconsistent with sound and economical home financing.

In the Board's view, Gulf Federal's policy of calculating interest under the 365/360 method when the contract calls for the 365/365 method is inconsistent with "sound and economical home financing" and thus violates section 1424(a).

■ We disagree with the Board for two reasons. First, section 1424(a) provides the criteria for membership in the federal savings and loan system. It does not establish a standard of specific conduct that is capable of violation. Even if Gulf Federal's conduct were "inconsistent with sound and economical home financing," the association would not have violated a law, it merely would have failed to meet the eligibility requirements for a federal savings and loan association.

■ More importantly, Gulf Federal's confused use of the inconsistent 365/365 interest calculation language in its contracts does not constitute action "inconsistent with sound and economical home financing." The Board concluded that the "sound and economical" provision was designed to protect borrowers from unfair lending practices. We disagree. Section 1424(a) disqualifies an institution when its "financial condition" is unsafe or its financing policy is not "sound and economical." The legislative history indicates that the possibility of bank failure was a foremost concern during the 1932 session in which section 1424(a) was enacted. *See, e. g.*, 75 Cong.Rec. 14456 (1932) (remarks of Sen. Fletcher). The more reasonable interpretation of the "sound and economical" provision is that it denies a federal charter to savings and loan associations whose policies may lead to future insolvency, not that it

---

5. We pretermit deciding whether violation of such laws would give rise to the Board's cease and desist power. The "violation of law" provision of section 1464(d)(2)(A) may be subject to the same limits as the "unsafe or unsound practice" provision discussed in Part III above. If so, the cease and desist power would arise only when an association violates a law which protects the association's financial integrity.

guarantees inexpensive mortgages to home-owners. While Gulf Federal's interest calculation provision mix-up is unfortunate, it does not threaten the association's financial well-being.

Some legislators evidenced a belief that the emphasis on "sound and *economical*" financing provided for inexpensive home financing. *See, e. g.*, 75 Cong.Rec. 14453 (remarks of Sen. Watson). But even if this history is accepted as controlling it would not support the Board's argument. The Board does not object to the 365/360 method because it is too expensive; it objects to the method because the loan agreement called for use of a different method. Thus, Gulf Federal's policy is not uneconomical, it is only inconsistent. It does not violate section 1424(a) even if the section is interpreted to require economical lending practices.

### B. *Federal Common Law*

█ The Board also found that Gulf Federal had violated federal common law and that this violation gave rise to the cease and desist power. The violation of federal common law identified by the Board was Gulf Federal's "breach" of the loan agreements. The Board concluded that state law and federal law were equivalent, and that it was not necessary to determine which law should be applied to Gulf Federal's conduct. It then cited the Restatement of Contracts, Louisiana case law, and cases from other states, in support of the black letter principle that unambiguous terms in a contract are to be enforced under their ordinary meaning. Because Gulf Federal had failed to calculate interest by the 365/365 method specified in one sentence of the loan agreements, the Board concluded that Gulf Federal had breached the loan agreements under federal common law.

The Board cited cases such as *Murphy v. Colonial Savings and Loan Ass'n*, 388 F.2d 609 (2d Cir. 1967), and *Rettig v. Arlington Heights Federal Savings and Loan Ass'n*, 405 F.Supp. 819 (N.D.Ill.1975), for the proposition that Congress has preempted state law in matters relating to federal savings and loan associations. *Murphy* held that management's duty to supply dissident shareholders with a shareholder list was governed by federal law and called for little more than an interpretation of the Board's regulations. *See* 388 F.2d at 611. *Rettig* held that federal law determined the extent of management's fiduciary duty when senior officials took personal advantage of a potential corporate opportunity. *See* 405 F.Supp. at 824. Neither case suggested that all conduct by a savings and loan is governed by federal law. These cases, and others like them cited by the Board, stand only for the proposition that federal law governs the *internal management* of federal savings and loan institutions.

Gulf Federal's conduct in this case, however, has nothing to do with the internal management of the association. The disputed loan agreement provision is part of a contract between the association and its borrowers. Such contracts do not implicate the sound management of the savings and loan or the insurance liability of the government, nor do they require a uniform federal rule to assure sound and well-managed savings and loan institutions. *See DeSimone v. Warwick Federal Savings and Loan Ass'n*, 482 F.Supp. 1190, 1194 (D.R.I.1980). Federal law does not establish whether Gulf Federal breached its agreements. Gulf Federal's loan agreements were made under Louisiana law, and Louisiana law must determine the rights of the parties to the contract.

### C. *Louisiana Law*

█ The Board also suggested that Gulf Federal had breached the loan agreements under Louisiana law. According to the Board, a breach of contract is a violation of Louisiana law, and this violation gives rise to the Board's cease and desist authority. We reject this conclusion. Even if a breach of contract is the kind of "violation of law" contemplated by section 1464(d)(2)(A), an issue we expressly pretermit,[6] Gulf Federal

---

6. See note 5, *supra*.

did not breach its agreements under Louisiana law.[7]

No party has suggested that Gulf Federal acted in bad faith in drafting its loan agreements. Each loan agreement calling for use of the 365/365 method also included on its face a statement of the exact amount of each payment of principal and interest to be made by the borrower, which amounts were calculated under the 365/360 method. Because the amount of payment specified in the contract was not calculated under the method specified in the text of the contract, the terms of the agreement are in conflict, and the contract, read as a whole, is ambiguous.

■ Under Louisiana law, the choice between conflicting contractual provisions is made to reflect the probable intent of the parties. See *Bolding v. Eason Oil Co.*, 248 La. 269, 178 So.2d 246, 250 (1965) (contract, viewed as whole, showed "vendor" should have been entered instead of "purchaser"); *Cerniglia v. Kral*, 170 La. 372, 127 So. 872, 873–74 (1930) (aberrant clauses disregarded); *Union Ferry Co. v. Southern Improvement and Ferry Co.*, 124 La. 759, 50 So. 704, 706 (1909) (course of dealing relevant when clauses conflict); *Peavy-Byrnes Lumber Co. v. Long-Bell Lumber Co.*, 55 F.Supp. 654, 659 (W.D.La.1944) (conflicting clauses in succeeding paragraphs governed by clause appearing in first paragraph). Under this principle, we are persuaded that Gulf Federal did not breach the agreements. The sentence calling for the 365/365 method of calculating interest was located in the midst of complicated text of the loan agreement, and apparently was ignored by all but one borrower. Even Gulf Federal's loan officers were unaware of its meaning. The typewritten amount of the monthly payment, by contrast, was a matter of meticulous concern, both for the borrowers and for Gulf Federal. In a transaction of this nature, it defies common sense to believe that the parties were more intent on specifying the method under which interest was to be calculated than they were on agreeing on the amount of monthly payments. Moreover, no borrower has filed or even suggested an action against Gulf Federal for breach of contract. Indeed, a brief filed in this case by borrowers of Gulf Federal takes Gulf Federal's position against the Board. This is additional evidence that, in the view of its borrowers, Gulf Federal performed its part of the agreement. Accordingly, we find that the intent of the parties was that monthly payments were to be made in the specific amount typewritten on the face of the loan agreement. Gulf Federal thus did not breach the loan agreements under Louisiana law. Because Gulf Federal's actions violated no law, the Board's cease and desist power cannot be asserted.

V.

In summary, we hold that the Board may use its cease and desist power when a savings and loan association commits an "unsafe or unsound practice" or a "violation of law." The "unsafe or unsound practice" provision, however, refers only to practices that threaten the financial integrity of the association. Gulf Federal's conduct in this case poses no such risk. Gulf Federal has violated none of the laws suggested by the Board. We pretermit deciding which laws, when violated, may give rise to the cease and desist authority. The petition for review is granted, and the decision of the Board is

REVERSED.

---

7. We originally certified this issue to the Supreme Court of Louisiana because we considered it determinative of the outcome of the appeal. That court refused certification. For this reason, we have made our own determination of the state law issue.