815 F.2d 1540
 259 U.S.App.D.C. 339, 55 USLW 2554, Fed.
Sec. L. Rep. P 93,063,
Fed. Sec. L. Rep. P 93,197
 INVESTMENT COMPANY INSTITUTE and Securities Industry
Association, Petitioners,
v.
FEDERAL DEPOSIT INSURANCE CORPORATION, et al., Respondents.
INVESTMENT COMPANY INSTITUTE, et al., Appellants,
v.
FEDERAL DEPOSIT INSURANCE CORPORATION, et al.
 Nos. 84-1616, 85-5769.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 18, 1986.
Decided April 7, 1987.
 
 Petition for Review of an Order of the Federal Deposit Insurance Corp. and Appeal from the United States District Court for the District of Columbia (D.C. Civil Action No. 84-3875).
 Harvey L. Pitt, Washington, D.C., with whom Henry A. Hubschman and David M. Miles, Washington, D.C., were on the brief, for petitioners in No. 84-1616 and appellants in No. 85-5769.
 Theodore C. Hirt, Atty., Dept. of Justice, Washington, D.C., with whom Richard K. Willard, Asst. Atty. Gen., Joseph E. diGenova, U.S. Atty., John C. Murphy, Jr., Gen. Counsel, Federal Deposit Ins. Corp., Ronald Glancz, Asst. Gen., Counsel, Federal Deposit Ins. Corp., and Anthony J. Steinmeyer, Atty., Dept. of Justice, Washington, D.C., were on the brief, for respondents in No. 84-1616 and appellees in No. 85-5769.
 Michael S. Helfer, Washington, D.C., was on the brief for amicus curiae Dealer Bank Ass'n, urging affirmance.
 John T. Gill, III, Johanna M. Sabol, and Michael F. Crotty, Washington, D.C., were on the brief for amicus curiae American Bankers Ass'n, urging affirmance.
 Before STARR and SILBERMAN, Circuit Judges, and WRIGHT, Senior circuit judge.
 Opinion for the court per curiam.
 
 PER CURIAM:
 
 1
 Petitioners/appellants Investment Company Institute (ICI) and Securities Industry Association (SIA) challenge regulations of the Federal Deposit Insurance Corporation (FDIC) governing the activities of insured banks that are not members of the Federal Reserve System. Petitioners principally argue that insofar as FDIC regulations allow nonmember insured banks to have subsidiary or affiliate relationships with firms engaged in securities work, those regulations violate the command of Sec. 21 of the Banking Act of 1933 (Glass-Steagall Act), 12 U.S.C. Sec. 378 (1982), that securities firms shall not engage in receiving deposits "to any extent whatever." We cannot agree. The clear language of the Glass-Steagall Act demonstrates that Congress intended to differentiate between the activities of banks and the activities of banks' subsidiaries and affiliates. As we see no provision in the Act, including Sec. 21, that prohibits subsidiaries or affiliates of nonmember insured banks from engaging in securities work, and because we find unmeritorious petitioners' arguments under Secs. 2 and 2 of the Federal Deposit Insurance Act, 12 U.S.C. Secs. 1816, 1818 (1982), we affirm the District Court's grant of summary judgment for the defendants, see ICI v. FDIC, 606 F.Supp. 683 (D.D.C.1985), and dismiss the petition for review of the regulation.
 
 I. BACKGROUND
 
 2
 Federal regulation effectively divides the United States commercial banking community into three major categories.[1] Banks that choose to become members of the Federal Reserve System fall under the jurisdiction of the Board of Governors of the Federal Reserve System. See 12 U.S.C. Secs. 221, 248 (1982). National banks come within the jurisdiction of the Comptroller of the Currency. See id. Finally, insured state banks that are not members of the Federal Reserve System operate under the watchful eye of the FDIC. See id. Secs. 1811, 1815. Although the FDIC insures the deposits of all three categories, id. Sec. 1811, it regulates directly only the third group. See generally id. Sec. 1815. The Glass-Steagall Act seeks to draw a sharp line between the activities of these three categories of commercial banks and the activities of investment banks and other securities firms. Id. Secs. 24, 78, 377, 378; Board of Governors v. Investment Company Institute, 450 U.S. 46, 63, 101 S.Ct. 973, 985, 67 L.Ed.2d 36 (1981) ("Board of Governors ").
 
 
 3
 This case explores the periphery of the separation of the banking and securities industries mandated by the Glass-Steagall Act. As the condition and character of the two industries have shifted over the past fifty years, the separation policy has shifted as well. Its changing shape has promoted particularly significant and protracted litigation in recent years, see, e.g., Securities Industry Ass'n v. Board of Governors, 468 U.S. 137, 104 S.Ct. 2979, 82 L.Ed.2d 107 (1984) ("Becker ") (commercial paper is a security under the Glass-Steagall Act); Securities Industry Ass'n v. Board of Governors, 468 U.S. 207, 104 S.Ct. 3003, 82 L.Ed.2d 158 (1984) ("Schwab ") (Board may allow bank holding company to acquire affiliate engaged in securities brokerage); Securities Industry Ass'n v. Board of Governors, 807 F.2d 1052, 1058 (D.C.Cir.1986) (Board may allow banks to sell third-party commercial paper), and has prompted this court to call upon Congress to clarify its precise contours. American Bankers Ass'n v. SEC, 804 F.2d 739, 755-56 (D.C.Cir.1986) (SEC has no authority to regulate securities activities of banks).
 
 
 4
 The specific issue presented here is the extent to which Congress intended to bar subsidiaries and affiliates of insured nonmember banks from engaging in the securities business. In September 1982 the FDIC published in the Federal Register a policy statement that found the Glass-Steagall Act "does not prohibit an insured nonmember bank from establishing an affiliate relationship with or organizing or acquiring a subsidiary corporation that engages in the business of issuing, underwriting, selling, or distributing stocks, bonds, debentures, notes, or other securities." 49 Fed.Reg. 46709 (Nov. 28, 1984). See 47 Fed.Reg. 38984 (Sept. 3, 1982). The FDIC did note, however, that the securities activities of such affiliates or subsidiaries might raise questions of "unsafe or unsound banking practices" and practices not "consistent with the purposes of" deposit insurance under Secs. 2 and 2 of the Federal Insurance Act (FDIA), 12 U.S.C. Secs. 1816, 1818 (1982). Id.[2]
 
 
 5
 In November 1984, after notice and comment proceedings, the FDIC adopted a final rule regulating the securities activities of affiliates and subsidiaries of insured nonmember banks under Secs. 2 and 2 of the FDIA. 49 Fed.Reg. 46709 (Nov. 28, 1984), regulations codified at 12 C.F.R. Sec. 337.4 (1986). Although the rule does not prohibit such securities activities outright, it does restrict that activity in a number of ways. Banks may only maintain "bona fide" subsidiaries that engage in securities work. The rule defines "bona fide subsidiary" so as to limit the extent to which banks and their securities affiliates and subsidiaries may share company names or logos, as well as places of business. 12 C.F.R. Sec. 337.4(a)(2)(ii), (iii); 49 Fed.Reg. at 46710. The definition also requires banks and subsidiaries to maintain separate accounting records and to observe separate corporate formalities. 12 C.F.R. Sec. 337.4(a)(2)(iv), (v). The two entities cannot share officers, and must conduct business pursuant to independent policies and procedures, including the maintenance of separate employees and payrolls. Id. Sec. 337.4(a)(2)(vi), (vii), (viii); 49 Fed.Reg. at 46711-12. Finally, and perhaps most importantly, the rule requires a subsidiary to be "adequately capitalized." 12 C.F.R. Sec. 337.4(a)(2)(i).
 
 
 6
 Petitioners Investment Company Institute and Securities Industry Association, representing mutual fund companies and investment bankers, simultaneously filed a petition for review in this court and an action to enjoin the regulation in the United States District Court for the District of Columbia. They argue that the rule violates Sec. 21 of the Glass-Steagall Act, 12 U.S.C. Sec. 378 (1982), and Secs. 2 and 2 of the Federal Deposit Insurance Act. 12 U.S.C. Secs. 1816, 1818 (1982). We stayed our proceedings until the District Court had ruled on the matter. Order of February 19, 1985. District Judge Gesell, on cross-motions for summary judgment, upheld the FDIC's regulations and dismissed the ICI and SIA action. ICI v. FDIC, 606 F.Supp. 683 (D.D.C.1985). We consider now both the appeal from that judgment (No. 85-5769), and the original petition for review of the FDIC rule (No. 84-1616).
 
 
 7
 II. PETITIONERS' STANDING UNDER THE GLASS-STEAGALL ACT AND
 
 THE FEDERAL DEPOSIT INSURANCE ACT
 
 8
 Before we address the merits of petitioners' challenge, we must examine the standing of securities industry plaintiffs to challenge the FDIC rule at issue. At the outset, we note that petitioners have shown sufficient "injury in fact" from these regulations for standing purposes. The FDIC will deal petitioners competitive injury by allowing insured nonmember banks to enter the securities field indirectly through subsidiaries and affiliates. See, e.g., Hardin v. Kentucky Utilities Co., 390 U.S. 1, 6, 88 S.Ct. 651, 654, 19 L.Ed.2d 787 (1967); Chicago Junction Case, 264 U.S. 258, 44 S.Ct. 317, 68 L.Ed.2d 667 (1924); see also ICI v. FDIC, 606 F.Supp. at 684 (FDIC regulation "plainly threatens" economic injury to securities firms).
 
 
 9
 But the standing inquiry, of course, does not end with "injury in fact." Competitive injury alone does not confer standing. Hardin, 390 U.S. at 5-6, 88 S.Ct. at 654-55. Once we find such injury, we must turn to the "prudential" or "zone of interests" standing test enunciated by the Supreme Court in Association of Data Processing Services v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). If the interest the petitioner seeks to protect is "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question," petitioner has standing.
 
 
 10
 The Supreme Court recently clarified the meaning of the "zone of interests" standing test in its opinion in Clarke v. Securities Industry Ass'n, --- U.S. ----, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987). In that case securities industry plaintiffs challenged a decision of the Comptroller of the Currency that national bank discount brokering services are not "branch services" for purposes of the McFadden Act. 107 S.Ct. at 754. The McFadden Act places stringent limits on interstate branch banking activities, see 12 U.S.C. Secs. 36(c) & (f), 81 (1982), and plaintiffs feared that the Comptroller's relatively narrow interpretation of the range of services the Act covers would expose the securities industry to competitive injury. Clarke, 107 S.Ct. at 754.
 
 
 11
 The Court rejected the Comptroller's argument that SIA lacked standing because Congress had not intended the McFadden Act to protect the competitive position of the securities industry. Id. at 759. The zone of interests test, stated the Court, "denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." Id. at 757. The Court found that the security industry's competitive interest bore a "plausible relationship" to the interests Congress sought to protect, id. at 759,[3] and that in any event there were "no indications * * * that make 'fairly discernible' a congressional intent to preclude review * * *." Id., quoting Block v. Community Nutrition Institute, 467 U.S. 340, 347, 104 S.Ct. 2450, 2454, 81 L.Ed.2d 270 (1984). Notably, the Court overturned this court's decision in Control Data Corp. v. Baldrige, 655 F.2d 283 (D.C.Cir.), cert. denied, 454 U.S. 881, 102 S.Ct. 363, 70 L.Ed.2d 190 (1981), and instructed the lower courts to consider "all indicators helpful in discerning" the interests and parties Congress intended to protect. Clarke, 107 S.Ct. at 757-58 & n. 15.[4]
 
 
 12
 With these guiding standards firmly in mind, we turn to petitioners' standing in this suit under Sec. 21 of the Glass-Steagall Act and Secs. 2 and 2 of the Federal Deposit Insurance Act.
 
 A. The Glass-Steagall Act
 
 13
 In Investment Company Institute v. Camp, 401 U.S. 617, 620-21, 91 S.Ct. 1091, 1093-94, 28 L.Ed.2d 367 (1971), the Supreme Court held that securities industry groups had standing to challenge regulations promulgated under the Glass-Steagall Act that allowed national banks to enter the securities field. The Court concluded that in Secs. 16 and 21 of the Act Congress "arguably" had legislated against the competition ICI sought to prevent. 401 U.S. at 620, 91 S.Ct. at 1093. We find that Camp controls our Glass-Steagall standing analysis in the present case.
 
 
 14
 The FDIC attempts to distinguish Camp by pointing out that ICI's challenge here rests on Sec. 21 alone. Section 21 is a criminal provision, notes FDIC, and thus seeks to protect the public interest, not the interests of securities firms. Implicitly, FDIC argues that the Camp Court actually rested its standing determination on Sec. 16, not Sec. 21.
 
 
 15
 Although the FDIC's point on the criminal focus of Sec. 21 is well taken, it does not adequately demonstrate that the present case is different from the situation in Camp. First of all, nothing in the Camp decision indicates that the Supreme Court meant to distinguish between Sec. 16 and Sec. 21 for standing purposes. 401 U.S. at 620, 91 S.Ct. at 1093. In fact, the Court's short standing discussion speaks of the two provisions in the same breath, and fails to draw any distinction whatever between them. Id. Second, even though Sec. 21 does contain a criminal penalty element, FDIC's authority to interpret that section stems from purely civil enforcement powers. 12 U.S.C. Sec. 1818 (1982). Section 21 has repeatedly and consistently received "civil" regulatory interpretation. See, e.g., Becker, 468 U.S. at 139, 104 S.Ct. at 2981; Board of Governors, 450 U.S. at 62, 101 S.Ct. at 984. After all, the Camp case itself was purely civil in nature. 401 U.S. at 617-18, 639, 91 S.Ct. at 1091-92, 1103. In fact, petitioners assert, without contradiction by respondents, that no criminal action has ever been brought under the section. Supplemental Brief for Appellants/Petitioners at 11 n. **.
 
 
 16
 Moreover, it is well established that courts applying the prudential standing test may look for the requisite protective intent on the part of Congress not only in the specific statutory provision at issue but also in other provisions of a statute. See Clarke, 107 S.Ct. at 758; Tax Analysts & Advocates v. Blumenthal, 566 F.2d 130, 141 (D.C.Cir.1977), cert. denied, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978); see also Autolog Corp. v. Regan, 731 F.2d 25, 30 n. 3 (D.C.Cir.1984). As the Supreme Court has specifically indicated that Sec. 16 and Sec. 21 seek to "draw the same line," Becker, 468 U.S. at 149, 104 S.Ct. at 2985, we appropriately look to Sec. 16 to help inform our standing decisions under Sec. 21. Clarke, 107 S.Ct. at 757-58. In so doing, our analysis falls squarely within the Supreme Court's Camp holding that ICI has standing under Sec. 16 and Sec. 21 to challenge regulations allowing banks to enter the securities field. As a consequence, Camp controls. Petitioners' standing under Sec. 21 of the Glass-Steagall Act to challenge these regulations is clear.
 
 B. The Federal Deposit Insurance Act
 
 17
 Sections 2 and 2 of the FDIA speak in broad terms, forbidding bank practices that are not "consistent with the purposes" of federal deposit insurance or that are "unsafe and unsound." 12 U.S.C. Secs. 1816, 1818 (1982). Petitioners argue that it is clear from the breadth of this language that Congress has legislated against the very activities that petitioners allege have caused them injury. See Clarke, 107 S.Ct. at 756, 759 (quoting Investment Company Institute v. Camp, 401 U.S. at 620, 91 S.Ct. at 1093).
 
 
 18
 Congress enacted the FDIA as part of the Banking Act of 1933, 48 Stat. 162, for purposes of providing for "the safer use of the assets of banks, to regulate interbank control, to prevent the undue diversion of funds into speculative operations, and for other purposes * * *." H.R.Rep. No. 150, 73d Cong., 1st Sess. 1 (May 19, 1933). Although Congress did not expressly indicate a desire to protect the competitive position of the securities industry, we cannot say that the industry's interests in limiting bank activities in the securities field are "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." Clarke, 107 S.Ct. at 757. As a consequence, we find that petitioners have standing under the FDIA to challenge the regulations at issue here.
 
 
 19
 The facts of the Clarke case bolster this conclusion. In Clarke a securities industry plaintiff asserted standing on the basis of competitive injury under the McFadden Act. 107 S.Ct. at 754. The language of that Act does not expressly protect the competitive position of the securities industry, and neither is any such intent on the part of Congress discernible from the legislative history. See Securities Industry Ass'n v. Comptroller of the Currency, 765 F.2d 1196, 1197 (D.C.Cir.1985) (en banc ) (per curiam ) (Scalia, J., dissenting from denial of rehearing en banc ) (dissent from Court of Appeals decision upheld in Clarke argues that Congress no more meant the McFadden Act to protect the securities industry's competitive position than it meant the Act to protect the position of "businesses competing for the parking spaces that an unlawful branch may occupy"). Nevertheless, the Supreme Court found that securities industry competitors were "very reasonable candidates" to seek review of the agency's ruling in that case. We see no basis for distinguishing the situation in Clarke for standing purposes from that confronting us in the present case.[5]
 
 
 20
 Finally, we find no indication "fairly discernible in the statutory scheme" of congressional intent to preclude judicial challenges by this particular class of petitioners. Clarke, 107 S.Ct. at 757. This case does not, for example, present a situation in which permitting suits by plaintiffs otherwise within the zone of interest would "severely disrupt [a] complex and delicate administrative scheme." Id. (quoting Community Nutrition Institute, 467 U.S. at 348, 104 S.Ct. at 2455).
 
 III. THE GLASS-STEAGALL ACT CHALLENGE
 
 21
 Petitioners present a straightforward statutory argument. Section 21 of the Glass-Steagall Act makes it illegal:
 
 
 22
 For any person, firm, corporation, association, business trust, or other similar organization, engaged in the business of issuing, underwriting, selling, or distributing, at wholesale or retail, or through syndicate participation, stocks, bonds, debentures, notes, or other securities, to engage at the same time to any extent whatever in the business of receiving deposits * * *.
 
 
 23
 12 U.S.C. Sec. 378(a)(1). Petitioners interpret the phrase "to any extent whatever" to bar insured nonmember banks from having subsidiaries or affiliates engaged in the securities business. FDIC responds that when Congress intended to bar subsidiary or affiliate relationships of this sort it clearly indicated that intent, and that in any event the court should defer to its reasonable interpretation.
 
 A.
 
 24
 In weighing these competing interpretations of Sec. 21 and the Glass-Steagall Act, we are bound by a venerable line of precedent counseling judicial deference toward an agency's evaluations of the statutes that give it legal life and authority. See, e.g., NLRB v. Hearst Publications, Inc., 322 U.S. 111, 131, 64 S.Ct. 851, 860, 88 L.Ed. 1170 (1944); Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969). That line of cases recently culminated in the Supreme Court's decision in Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), which established a simple two-part test, now familiar. If Congress has spoken clearly to the issue presented in a case, that intent controls. 467 U.S. at 844, 104 S.Ct. at 2782. If the agency's interpretation is contrary to the clear intent of Congress, the agency's interpretation is invalid. If, on the other hand, Congress had no clear intent as to the particular question at issue, the courts may invalidate the agency's interpretation only if it is "unreasonable" or "impermissible." Id. As we find in the present case that Congress clearly intended Sec. 21 to allow insured nonmember banks to maintain subsidiary or affiliate relationships with securities firms, we uphold FDIC's interpretation of Sec. 21 and affirm the District Court. Given this clear intent, we need not reach Chevron 's "reasonableness" prong of analysis.B.
 
 
 25
 Congress enacted the Glass-Steagall Act in response to the dramatic wave of bank failures of the early Depression, a wave that many perceived to have been the result of securities speculation by the banking industry. See Board of Governors, 450 U.S. at 61 & n. 28, 101 S.Ct. at 984 & n.28; Camp, 401 U.S. at 629-30. The Act seeks to separate the banking and securities industries "as completely as possible." Board of Governors, 450 U.S. at 70, 101 S.Ct. at 989. But while Congress may have intended to build an insurmountable barrier between member banks of the Federal Reserve System and the securities industry, see 12 U.S.C. Secs. 24, 78, 377 (1982), Congress was far from certain in 1933 that it had authority to effect such a sweeping separation for insured state nonmember banks. In fact, several members of Congress nervously commented during the debate leading to enactment of the bill that Congress might lack power to regulate nonmember banks at all. See 75 Cong.Rec. 9905 (May 10, 1932) (remarks of Sen. Walcott); id. at 9911, 9913-14 (remarks of Sen. Bulkley).
 
 
 26
 The hesitation of the 73rd Congress to regulate state nonmember banks is quite apparent in the actual language of the Act. National banks and banks that have chosen to become members of the Federal Reserve System are subject to stringent regulation that bars them from the securities field. Section 16 severely limits the ability of national banks to deal in securities and bars them from underwriting securities. 12 U.S.C. Sec. 24 (1982); see also Securities Industry Ass'n v. Board of Governors, 807 F.2d 1052 (D.C.Cir.1986). Section 20 bars firms "principally" engaged in securities transactions from affiliating with member banks. 12 U.S.C. Sec. 377 (1982). Section 32 bars member banks from sharing officers or board members with securities firms. 12 U.S.C. Sec. 78 (1982).
 
 
 27
 Only Sec. 21 regulates both member and nonmember banks. Section 21 bars any "person, firm, corporation, association, business trust, or other similar organization" from engaging in securities business while receiving deposits "to any extent whatever." 12 U.S.C. Sec. 378 (1982). It says nothing explicitly about the propriety of insured nonmember banks establishing subsidiaries or affiliates that engage in the securities business. Petitioners suggest, nevertheless, that Congress intended that the section prohibit such relationships.
 
 
 28
 This argument is difficult to support. If we read Sec. 21 to prohibit insured nonmember banks from establishing securities subsidiaries or affiliates, the coherence of the statute as a whole begins to crumble. Section 21 applies to both member and nonmember banks. If it prohibits all bank affiliate or subsidiary relationships with securities firms, then Sec. 20's somewhat permissive language, which allows member banks to establish affiliate relationships with firms doing some limited amount of securities work, becomes meaningless. Accepting petitioners' interpretation, therefore, would require us to eliminate a provision of the statute, a clear violation of a fundamental canon of construction. See National Insulation Transportation Committee v. ICC, 683 F.2d 533, 537 (D.C.Cir.1982); In re Surface Mining Regulation Litigation, 627 F.2d 1346, 1362 (D.C.Cir.1980).
 
 
 29
 Petitioners play down this difficulty by arguing that Sec. 20 constitutes a special exception for member banks to the general prohibition set out by Sec. 21. Petitioners submit that although banks generally cannot maintain affiliate or subsidiary relationships with securities firms "to any extent whatever," Sec. 20 specifically authorizes member banks to maintain such relationships with firms not "principally" engaged in securities work. Nonmember banks, however, cannot maintain such relationships. This explanation suffers from two readily apparent flaws.
 
 
 30
 First of all, Congress knew how to indicate that a section of the Act was intended as a specific exception to another section. Congress amended Sec. 21 in 1935 to include language that expressly indicated that activities implicitly authorized under Sec. 16 of the Act were not barred by Sec. 21's broad language. Act of August 23, 1935, c. 614, Sec. 303, 49 Stat. 707; see also Securities Industry Ass'n v. Board of Governors, 807 F.2d 1052, 1056 (D.C.Cir.1986) (discussing interplay of Secs. 16 and 21). Congress has not done the same for Sec. 20, and we see no basis whatever for inferring such intent. On the contrary, Sec. 20 speaks in the language of prohibition, not authorization. Member banks "shall not be affiliated in any manner * * * with any corporation, association, business trust, or other similar organization engaged principally" in securities activities. 12 U.S.C. Sec. 377 (1982). Congress presumably did not indicate that Sec. 20 should be an "exception" to Sec. 21 because it did not intend that Sec. 21 should extend to the activities of affiliates and subsidiaries in the first place. The two sections regulate separate activities.
 
 
 31
 Second, if we were to accept petitioners' argument that Sec. 20 exempts member banks from the full prohibitory force of a Sec. 21 that applies to both banks and their affiliates, we would be left with an anomalous result. Under petitioners' interpretation, member banks would be subject to less stringent Sec. 21 regulation than would be insured nonmember banks. This outcome is dramatically counter to what we would expect on examination of the statute and its history. It seems clear that Congress felt its efforts to regulate nonmember banks rested on shaky, if not ramshackle, authority. Members of Congress explicitly discussed this problem as it pertained to regulation of nonmember bank affiliates, and specifically indicated that regulation of such affiliates was probably beyond the power of Congress.[6] That Congress would have imposed more demanding regulation on nonmember banks than on member banks, given this uncertainty, seems utterly improbable. Absent clear evidence, we will not infer that Congress had such contrary, even irrational, intentions for the statute.
 
 
 32
 Despite petitioners' considerable efforts, then, the language and structure of the Glass-Steagall Act do not support the view that Sec. 21 bars insured nonmember banks from maintaining affiliate or subsidiary relationships with securities firms. Section 21 on its face fails to prohibit such relationships, and any judicial inference of such a prohibition would be inconsistent with the overall structure of the Act. This reasoning standing on its own demonstrates not only that FDIC's interpretation of Sec. 21 is "permissible" but, in fact, that it is the only valid approach.
 
 
 33
 Moreover, the Supreme Court's guidance on the proper scope of Sec. 21 supports the agency's interpretation. In Board of Governors v. Investment Company Institute, 450 U.S. 46, 101 S.Ct. 973, 67 L.Ed.2d 36 (1981), the Supreme Court addressed the argument that Sec. 21 applies to bank holding companies as well as to banks, and that as a consequence it bars bank holding company subsidiaries from engaging in securities work. The Court found that "the language of Sec. 21 cannot be read to include within its prohibition separate organizations related by ownership with a bank, which does receive deposits." 450 U.S. at 58 n. 24, 101 S.Ct. at 982 n. 24. As if this statement were not clear enough, the Court went on to emphasize that because Sec. 20 specifically addressed the proper relationship between member banks and securities affiliates, "the structure of the Act reveals a congressional intent to treat banks separately from their affiliates. The reading of the Act urged by respondent [arguing for 'single entity' treatment of banks and their affiliates under Sec. 21] would render Sec. 20 meaningless." Id. And to lay the question to rest once and for all, the Court stated that under Glass-Steagall "bank affiliates may be authorized to engage in certain activities that are prohibited to banks themselves." Id. at 60, 101 S.Ct. at 983. In light of our reasoning above, this language clearly guides the proper holding on the issue presented in this case. The agency's interpretation of Sec. 21 is entirely consistent with Congress' intent, and must stand.
 
 C.
 
 34
 Petitioners put forward no direct response to the Supreme Court's analysis in Board of Governors. Instead, they argue that the FDIC's rule is at odds with "the legislative purpose underlying Section 21." Brief for Appellants/Petitioners at 21. This is not a legislative history argument aimed at proving that the express terms of Sec. 21 actually do bar nonmember bank activities of the sort the petitioners challenge. Rather, petitioners' argument merely adverts to the general policy objectives of the Glass-Steagall Act and attempts to demonstrate that those policies are thwarted, or at least are not furthered, by the FDIC rule at issue here. Id. at 27-33.
 
 
 35
 Petitioners' policy arguments can carry but little weight in a judicial forum. Our duty as a court is to interpret the banking laws, not to set national banking policy on the basis of general objectives set out by Congress. See, e.g., American Bankers Ass'n, 804 F.2d at 749. Petitioners have failed to demonstrate that Congress' intent in this provision is unclear. Even if they had, and if every policy objection they raise were irrefutable, we could not overturn FDIC's regulation unless the face of the statute and its legislative history demonstrated that FDIC's interpretation was "impermissible" or "unreasonable." Chevron, 467 U.S. at 843-44, 104 S.Ct. 2782. Petitioners' "legislative purpose" arguments do not take this approach, however. They focus on policy alone. As the Supreme Court recently stated, "When a challenge to an agency construction, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left by Congress, the challenge must fail." Chevron, 467 U.S. at 866, 104 S.Ct. at 2793. It is not our place to implement congressional policy in ways Congress itself fails to pursue. Board of Governors v. Dimension Financial Corp., --- U.S. ----, 106 S.Ct. 681, 688-89, 88 L.Ed.2d 691 (1986); TVA v. Hill, 437 U.S. 153, 194-95, 98 S.Ct. 2279, 2301-02, 57 L.Ed.2d 117 (1978). Congressional intent for Sec. 21 is clear, and FDIC's interpretation is in line with that intent. We need go no further to uphold FDIC's view of the matter.
 
 
 36
 IV. THE FEDERAL DEPOSIT INSURANCE ACT CHALLENGES
 
 
 37
 Petitioners also argue that the rule violates the "unsafe and unsound banking practices" provisions of the Federal Deposit Insurance Act. 12 U.S.C. Secs. 1818(a) & (b), 1816 (1982) (powers of state chartered banks must be "consistent with the purposes of" federal deposit insurance). Quoting the Fifth Circuit, petitioners assert that the FDIC rule here presents an "abnormal risk of loss or damage to an institution, its shareholders, or the agencies administering the insurance funds." Brief for Appellants/Petitioners at 33-34, quoting Gulf Federal Savings & Loan Ass'n v. Federal Home Loan Bank Board, 651 F.2d 259, 264 (5th Cir.1981).
 
 
 38
 The FDIC itself, of course, has recognized that bank subsidiaries and affiliates engaged in securities activities pose dangers under these two sections. See 49 Fed.Reg. at 46709. In fact, the rule promulgated by the FDIC undertakes to ensure that the harms Congress sought to prevent with the Federal Deposit Insurance Act do not become real. Petitioners' argument, then, is not that the rule is inconsistent with these sections of the FDIA, but rather that the rule does not go far enough, as it fails to find affiliate or subsidiary relationships of this kind per se "unsafe and unsound."
 
 
 39
 The failure of this challenge on its merits is unquestionable. Petitioners' FDIA arguments rest, in the first instance, on the assumption that the FDIC rule is invalid under Sec. 21. See Brief for Appellants/Petitioners at 34. As we have found above that the rule is entirely consistent with Sec. 21, this element of petitioners' argument collapses of its own weight.
 
 
 40
 But even if we read the FDIA challenge to include an independent attack on the FDIC rule, it does not persuade us to invalidate that rule. Petitioners have not demonstrated that when Congress used the broad language "unsafe and unsound banking practices" it intended a specific result on the issue presented here. And for good reason. Congress intended to delegate a substantial degree of authority to the agency by the use of this language. See Investment Company Institute v. FDIC, 728 F.2d 518 (D.C.Cir.1984); Independent Bankers Ass'n v. Heimann, 613 F.2d 1164, 1169 (D.C.Cir.1979). Authority to determine what constitutes an "unsafe" or "unsound" banking practice is firmly committed to the agency. See, e.g., First National Bank of Lamarque v. Smith, 610 F.2d 1258, 1265 (5th Cir.1980).
 
 
 41
 Under the Supreme Court's Chevron analysis, if the intent of Congress on a particular issue is not clear, the courts may only overturn the agency's view of that issue if it is "impermissible" or "unreasonable." Chevron, 467 U.S. at 843-44, 104 S.Ct. at 2782. Petitioners have given us no rationale that demonstrates the "unreasonableness" of FDIC's decision to impose stringent regulations on insured nonmember banks' affiliate and subsidiary relationships with securities firms, in lieu of pursuing an outright ban on such relationships. As the regulation adopted by the FDIC represents precisely the sort of expert decision Congress committed to that agency, see Investment Company Institute v. FDIC, 728 F.2d at 523, petitioners' mere assertion that it is inconsistent with the underlying policies of the FDIA simply cannot carry the day. We find that the agency's rule is consistent with Secs. 2 and 2 of the FDIA.
 
 V. CONCLUSION
 
 42
 Petitioners have standing to challenge these FDIC regulations under the Glass-Steagall Act and the FDIA. As the FDIC has demonstrated, however, that its rule is consistent with the clear intent of Congress in the Glass-Steagall Act, and because we find FDIC's construction of the broad language of FDIA Secs. 2 and 2 to be reasonable, we affirm the District Court's grant of summary judgment in No. 85-5769, and dismiss the petition for review in No. 84-1616.
 
 
 43
 So ordered.
 
 
 
 [1]
 A "fourth" category, consisting of the 27 Federal Savings Banks regulated by the Federal Home Loan Bank Board, is a much smaller element of the banking community. See Brief for Appellees/Respondents at 4; 12 U.S.C. Sec. 1464(a) (1982)
 
 
 [2]
 Petitioners challenged the Policy Statement. Their suit was dismissed without prejudice, pending the outcome of FDIC's rulemaking process. Investment Company Institute v. United States, D.D.C. Civil Action No. 82-2532, filed September 8, 1982
 
 
 [3]
 The Court found that Congress intended the Act both to prevent branch banking activities from allowing the concentration of control over money and credit in a small number of powerful national banks, and to equalize the status of state and federal banks. Clarke, 107 S.Ct. at 759
 
 
 [4]
 The Control Data opinion had established a requirement that Congress' intent to protect an interest asserted by a plaintiff be shown via some "slight beneficial indicia" either in the language of the relevant statutory provisions themselves, or in the legislative history of those provisions. 655 F.2d at 293-94. The opinion implicitly forbade consideration of other sources to discern the intent of Congress
 
 
 [5]
 As we find petitioners are within the zone of interests "protected" by the statute, we need not consider the "regulated" prong of the zone test. See Reply Brief for Appellants/Petitioners at 4 n. 7; Data Processing, 397 U.S. at 153, 90 S.Ct. at 829. But see Calumet Industries, Inc. v. Brock, 807 F.2d 225 (D.C.Cir.1986) ("regulated" prong does not create standing where, at base, the harm alleged stems from an agency's failure to regulate another party with sufficient stringency)
 
 
 [6]
 In fact, one passage seems nearly sufficient in itself to establish that Congress did not mean Sec. 21 to extend to nonmember bank affiliates and subsidiaries:
 Mr. FESS. Earlier in the Senator's presentation he mentioned the fact that whether it be a national bank or a State bank, the control of affiliates does not extend outside of the Federal reserve set-up; that is, an affiliate of a State bank that is not a member of the Federal reserve system is not covered, is it?
 Mr. WALCOTT. Mr. President, there are state banks which exist now within the Federal reserve system, and they are member banks.
 Mr. FESS. Yes.
 Mr. WALCOTT. There are national banks within the Federal reserve system. Most of the national banks are under the Federal reserve system; so that, whether State or whether national, provided the bank is a member of the Federal reserve system and has an affiliate, that affiliate must be divorced within three years.
 Mr. FESS. The provision does not attempt to go beyond the Federal reserve system?
 Mr. WALCOTT. It does not control State banking, and the reason for that is obvious: The Federal Government has no jurisdiction over State banks.
 
 
 [75]
 Cong.Rec. 9905 (May 10, 1932), quoted in 606 F.Supp. at 686 n. 6. District Judge Gesell described this discussion as "unequivocal," and we are hard-pressed to disagree