EL PASO NATURAL GAS COMPANY, Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent.

Public Utilities Commission of the State of California; Arizona Public Service Company; Salt River Project Agricultural Improvement and Power District; Meridian Oil Inc.; San Diego Gas & Electric Company; Southern California Gas Company; Southwest Gas Corporation; Transwestern Pipeline Company, Intervenors.

No. 94–1059.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 28, 1995.

Decided March 21, 1995.

Richard C. Green, Washington, DC, argued the cause, for petitioner. With him on the briefs, were James R. McCotter, El Paso, TX, Mark F. Sundback, Peter J. Thompson, Washington, DC and Phillip D. Endom, El Paso, TX. Britton White, Jr., El Paso, TX, entered an appearance.

Eric L. Christensen, Atty., F.E.R.C., Washington, DC, argued the cause, for respondent. With him on the brief, were Jerome M. Feit, Sol., and Joseph S. Davies, Jr., Deputy Sol., F.E.R.C., Washington, DC.

Mark Fogelman, San Francisco, CA, argued the cause, for intervenors. With him

on the joint brief, were Edward W. O'Neill, San Francisco, CA, for Public Utilities Commission of the State of California, Douglas M. Gleason, James P. Walsh and Nicholas W. Fels, Washington, DC, for San Diego Gas & Electric Co. and David J. Gilmore, Los Angeles, CA, for Southern California Gas Co. Barbara S. Jost and Joel L. Greene, Washington, DC, entered appearances, for Arizona Public Service Co. and Salt River Project Agricultural Improvement and Power Dist. Kim M. Clark, Washington, DC, entered an appearance, for Meridian Oil Inc. John C. Walley, Las Vegas, NV, entered an appearance, for Southwest Gas Corp. Sherrie N. Rutherford, Houston, TX, and Steve Stojic, Washington, DC, entered appearances, for Transwestern Pipeline Co.

Before EDWARDS, Chief Judge, WALD and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Petitioner El Paso Natural Gas Company ("El Paso") seeks review of two orders of the Federal Energy Regulatory Commission holding that a proposal by two local distribution companies ("LDCs") located in California to extend their pipeline network into Mexico would not bring the network within the Federal Energy Regulatory Commission's ("FERC" or "Commission") jurisdiction under §§ 4 and 7 of the Natural Gas Act ("NGA" or "Act"). 15 U.S.C. §§ 717c, 717f (1988). El Paso argues that FERC's determination contravened both the terms of the NGA and Commission precedent. We hold that El Paso lacks standing because it has failed to demonstrate aggrievement or a likelihood of imminent injury under the chal-

1. The NGA defines "natural-gas company" as any individual or corporation "engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale." 15 U.S.C. § 717a(6).

2. Under Executive Order No. 10,485, 18 Fed. Reg. 5397 (1953), as amended by Executive Order No. 12,038, 43 Fed.Reg. 4957 (1978), constructing transmission facilities at the border between the United States and a foreign country

lenged rulings, and we therefore dismiss the petition without reaching the merits.

## I. BACKGROUND

### A. *Regulatory Background*

The NGA regulates the transportation and sale of natural gas in interstate commerce. Three sections of the Act are particularly relevant to this case. Section 7 provides that "[n]o natural-gas company[1] or person which will be a natural-gas company upon completion of any proposed construction or extension shall engage in the transportation or sale of natural gas" without first obtaining a certificate of public convenience and necessity from the Commission. *Id.* at § 717f(c)(1)(A). Section 4 requires that "natural-gas companies" must maintain their rates for transportation or sale of gas on file with the Commission. *Id.* at § 717c(c).

Section 3 of the NGA is broader in scope than §§ 4 and 7. It requires that the Commission must approve the exportation or importation of natural gas by any "person" unless it finds that the project "will not be consistent with the public interest." *Id.* at § 717b. Because this section addresses "person[s]," rather than "natural-gas companies," the need for compliance with § 3 extends to all importers or exporters of natural gas, regardless of whether they operate in interstate commerce.[2]

The "Hinshaw Amendment," contained in § 1(c) of the NGA, exempts certain facilities that transport or sell "interstate" gas but that are located within a single state from many provisions of the NGA, including §§ 4 and 7:

The provisions of this chapter shall not apply to any person engaged in ... the transportation in interstate commerce or the sale in interstate commerce for resale,

also requires a "Presidential Permit," signifying the approval of the Secretaries of State and Defense. As a practical matter, applicants request this authorization from the Commission, who submit a draft Permit to the Secretaries for their recommendation. If the Secretaries approve, the Commission issues the Permit. *See San Diego Gas & Electric Co.,* 64 F.E.R.C. ¶ 61,221 at 62,652 (1993).

of natural gas received by such person from another person within … a State if all the natural gas so received is ultimately consumed within such State, or to any facilities used by such person for such transportation or sale, provided that the rates and service of such person and facilities be subject to regulation by a State commission. The matters exempted from the provisions of this chapter by this subsection are declared to be matters primarily of local concern and subject to regulation by the several states.

15 U.S.C. § 717(c) (1988). Because the Hinshaw Amendment exempts "Hinshaw pipelines" only from aspects of the NGA "subject to regulation by a State Commission," and state commissions have no authority to approve exportation or importation of natural gas, the requirements of § 3 apply even to Hinshaw pipelines. *See, e.g., Empire State Pipeline*, 64 F.E.R.C. ¶ 61,035 at 61,335–36 (1993).

### B. *Factual Background*

Petitioner El Paso transports natural gas in interstate commerce from various gas sources to distributors. It is a "natural-gas company," as defined by the NGA, 15 U.S.C. § 717(a)(6), and is therefore subject to FERC's §§ 4 and 7 jurisdiction.

Among El Paso's customers are two LDCs, San Diego Gas & Electric Company ("SDGE") and Southern California Gas Company ("SoCal"), whose pipeline network serves southern California. The LDCs are Hinshaw pipelines, and so exempt from FERC regulation under §§ 4 and 7 of the NGA. Their rates, services, and facilities are regulated by the Public Utilities Commission of the State of California ("CPUC").

This case involves a proposal ("Project Vecinos") by the LDCs to extend their service into Baja California, in Mexico. The Project contemplates construction of 110 miles of new pipeline in California, primarily to transport gas to Mexico, but which would also convey gas for consumption in California. In addition, Project Vecinos would require the LDCs to construct and operate a border crossing facility at the Mexican frontier, including a 2.1 mile pipeline (the "Otay Mesa Extension") that would connect the LDCs network to a Petroleos Mexicanos facility.

### C. *Procedural Background*

In December 1992, SDGE applied to the Commission for § 3 authorization and a Presidential Permit to construct the Otay Mesa Extension. At the same time, the LDCs filed a joint petition for a declaratory order stating that execution of Project Vecinos would not jeopardize the Hinshaw status of their distribution network upstream of the Otay Mesa Extension. El Paso intervened in opposition to the LDCs' declaratory order request.

In August 1993, the Commission issued an order granting the necessary § 3 authorization and Presidential Permit. *See San Diego Gas & Electric Co.*, 64 F.E.R.C. ¶ 61,221 at 62,651–52 (1993). It also declared that upon completion of Project Vecinos, the LDCs would retain their Hinshaw status and thus did not require § 7 authorization to execute the Project. *Id.* at 62,653. The Commission reasoned that gas exported to Mexico would be in "foreign," not interstate commerce, and so could not render the LDCs "natural-gas companies" subject to the requirements of § 7 of the NGA. Because the remainder of the gas would be "consumed in California," the Commission believed that the LDCs would continue to satisfy the requirements of the Hinshaw Amendment. *Id.*

El Paso timely petitioned the Commission for rehearing. It argued that FERC precedent establishes that "interstate gas" sold in foreign commerce remains in interstate commerce until it reaches the border. Therefore, upon completion of the Project, the LDCs would be engaged in interstate commerce, rendering them "natural-gas companies" subject to §§ 4 and 7 of the NGA. Moreover, El Paso argued, the LDCs would no longer fall within the Hinshaw Amendment, because the gas exported to Mexico would not be "consumed" within California as the Amendment mandates. El Paso concluded that the LDCs were therefore required to obtain § 7 authorization before executing Project Vecinos, and should be subject to rate regulation by FERC under § 4 upon completion of the Project.

In December 1993, the Commission issued an order denying rehearing for essentially the reasons advanced in its earlier decision. *San Diego Gas & Electric Co.*, 65 F.E.R.C. ¶ 61,299 (1993). El Paso petitioned this court for review on the same grounds advanced in its petition for rehearing to the Commission.

## II. DISCUSSION

### A. *The "Injury–in–Fact" Requirement*

■ FERC challenges El Paso's standing to pursue this petition. We agree with the Commission that El Paso has failed to demonstrate aggrievement or the likelihood of imminent injury under FERC's rulings, and we therefore dismiss the petition without reaching the merits.

■ Pursuant to § 19(b) of the NGA, 15 U.S.C. § 717r(b), only a party that is "aggrieved" by an order issued under the Act may obtain judicial review thereof. *See, e.g., Moreau v. FERC*, 982 F.2d 556, 564 (D.C.Cir.1993). In addition, like all parties seeking access to the federal courts, petitioners must satisfy the requirements of constitutional standing. "Common to both these thresholds is the requirement that petitioners establish, at a minimum, 'injury in fact' to a protected interest." *Shell Oil Co. v. FERC*, 47 F.3d 1186, 1200 (D.C.Cir.1995).

The Supreme Court recently held that to demonstrate "injury in fact" under Article III, a party must allege an invasion of legally protected interests that is both (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). El Paso advances two separate arguments in an attempt to meet this minimal requirement; it claims to have suffered "injury in fact" as an "upstream transporter" of gas for the LDCs, and as a "potential competitor" of the LDCs for customers in Baja California.

### B. *The "Upstream Transporter" Argument*

El Paso claims that FERC's ruling that the LDCs will retain their Hinshaw status affects petitioner in its role as an "upstream transporter" because gas sold by El Paso to the LDCs will not be transported and resold subject to regulation under §§ 4 and 7 of the NGA, but rather on terms controlled by CPUC. Petitioner argues that this absence of "protections mandated by federal law"—after El Paso's gas is delivered to the LDCs—constitutes "injury in fact."

Petitioners do not, however, suggest that the downstream "protections" of California state regulation are currently any less advantageous to El Paso than those of the NGA. Indeed, counsel for petitioner conceded at oral argument that CPUC regulation of the LDCs could prove more favorable to El Paso than FERC regulation would be. Certainly petitioner has not, either in its briefs or at oral argument, pointed to any concrete element of CPUC regulation that presently fails to measure up to the NGA's protections.

Instead, El Paso advances a number of ways in which CPUC regulation might harm El Paso in the future. All appear to be variations on the theme that CPUC may accord "preferential treatment to shippers who make use of locally-regulated facilities over shippers who might otherwise rely primarily on federally regulated pipelines, such as El Paso." Again, however, petitioner fails even to argue that injury from such potential prejudicial treatment has occurred or is in any way imminent.

In *Shell Oil Co. v. FERC*, 47 F.3d at 1186 (D.C.Cir.1995), this court recently confronted a similar argument that FERC's finding of jurisdiction under one regulatory scheme rather than another constituted "injury in fact." In *Shell*, petitioners sought access to the Bonito Pipe Line Company's ("Bonito") network on the Outer Continental Shelf under the access provisions of both the Outer Continental Shelf Lands Act ("OCSLA") and the Interstate Commerce Act ("ICA"). The Commission ruled for Shell under the OCSLA, but found that it lacked jurisdiction under the ICA. Shell petitioned this court for review of FERC's jurisdictional ruling on the ground that the ICA provides certain rate protections and filed tariff requirements that have no counterpart in the OCSLA. Shell argued that the Commission's order both

opened the door to Bonito to impose tariffs that would be unreasonable under the ICA, and denied petitioners their statutory right to know the rates and terms of other shippers.

The court found that Shell lacked standing to challenge the Commission's jurisdictional ruling. It noted that Shell had "failed to point to any existing practices that would have been prohibited under the ICA" but were allowed under the OCSLA. *Id.*, 47 F.3d at 1201. Instead, "Shell's allegations of injury rest[ed] on a hypothetical scenario" in which "the Bonito owners . . . at some point in the future exact excessive . . . rates and [ ] the Commission denies the protection of the ICA." *Id.*, 47 F.3d at 1202. The court concluded: "[While] such injury is not inconceivable, we are unpersuaded that it is *imminent,* as it must be under traditional standing analysis." *Id.*

The same is true in this case. El Paso's alleged "injury" flows from the hypothetical premise that CPUC may some day promulgate regulations that favor CPUC-regulated entities over FERC-regulated entities, and that FERC will deny the protections of the NGA. This scenario is certainly within the realm of possibility, but we are unconvinced that it portends sufficiently imminent injury to confer standing on El Paso. Of course, as in *Shell,* "[o]ur decision does not [ ] bar future efforts by [El Paso] to challenge the Commission's conclusion that it lacks jurisdiction under the [NGA], if the Commission's adherence to its interpretation produces [injury in fact] to [El Paso]." *Id.*, 47 F.3d at 1203.

## C. The "Potential Competitor" Argument

El Paso also argues that it has sustained injury in fact because it may one day compete with the LDCs in Baja California, and will be obliged to operate under FERC regulation while the LDCs are subject to the authority of CPUC. We reject this argument as well.

We think it insufficiently clear that El Paso will, in fact, ever compete with the LDCs for customers in Mexico. In November 1993, FERC granted El Paso § 3 authorization to construct facilities to serve the area of Baja California targeted by Project Vecinos, but denied petitioner's request for § 7 authorization on the ground that they had failed to produce agreements demonstrating a demand for El Paso gas in the region. *El Paso Natural Gas,* 65 F.E.R.C. ¶ 61,276 at 62,270 (1993). Although FERC then afforded El Paso ample opportunity to furnish such evidence, El Paso instead elected to withdraw its request in June 1994. At present, then, it is wholly speculative that El Paso will ever "compete" with the LDCs in Baja California.

■ We note, moreover, that it is uncertain whether petitioner would have standing to challenge FERC's jurisdictional determination even if they were currently competing with the LDCs for Mexican customers. This court's "competitor standing" cases, upon which petitioner relies, appear inapposite to such circumstances. The nub of the "competitive standing" doctrine is that when a challenged agency action authorizes allegedly illegal transactions that will almost surely cause petitioner to lose business, there is no need to wait for injury from specific transactions to claim standing. In *Investment Company Institute v. Federal Deposit Insurance Corporation,* 815 F.2d 1540 (D.C.Cir.1987), for example, mutual fund companies challenged, as violative of the Glass–Steagall Act, Federal Deposit Insurance Corporation regulations that permitted nonmember insured banks to establish subsidiary and affiliate relationships with firms engaged in securities work. In holding that the petitioners had constitutional standing on the basis of competitive injury, the court cited no specific instances of injury, but noted that "allowing insured non-member banks to enter the securities field indirectly through subsidiaries and affiliates" would "plainly threaten" economic injury to the petitioners in the form of lost customers. *Id.* at 1543.

In *Associated Gas Distributors v. FERC,* 899 F.2d 1250 (D.C.Cir.1990), we found standing on similar grounds. Petitioner Associated Gas Distributors ("AGD") there questioned whether § 311 of the National Gas Policy Act ("NGPA"), 15 U.S.C. § 3371

(1988), authorized FERC to issue blanket exemptions from the requirements of the NGA's § 7, so long as some intrastate pipeline or LDC benefitted from the proposed transportation. FERC challenged the AGD's standing on the ground that it was "purely speculative" whether the allegedly illegal § 311 transactions would actually harm petitioner. *See id.* at 1258. The court noted, however, that "[a]t least one LDC ha[d] already been bypassed by allegedly illegal § 311 transportation," and held that the "clear and immediate potential" that more allegedly illegal transportation would interfere with petitioner's sales conferred standing.

The present case diverges in a critical respect from *Investment Company, Associated Gas,* and our other "competitor standing" cases. El Paso does not appear to argue that the LDCs are not legally entitled to serve the Mexican customers for which El Paso hopes to compete. Rather, they emphasize that FERC's decision means that CPUC, rather than FERC, will regulate the LDCs' proposed facilities in California. They object that if CPUC regulates the LDCs' facilities, and El Paso one day constructs competing facilities subject to FERC regulation, the LDCs could enjoy a competitive advantage if CPUC regulation proves more favorable to pipelines than FERC regulation.

This argument, however, runs smack into the same impediment as petitioners' "upstream transporter" claim. If El Paso actually were a "competitor," its purported "injury" would apparently rest on the hypothesis that CPUC oversight is less onerous than FERC regulation. As we explain *supra* at 26–27, however, petitioner has failed even to make a case that such a difference in regulatory burdens in fact exists. We therefore caution that even if El Paso were "competing" with the LDCs in Mexico, that would not necessarily bring petitioners within the ambit of our "competitor standing" cases. El Paso would still be required to allege facts demonstrating "injury in fact." *Cf. King Bridge Co. v. Otoe County,* 120 U.S. 225, 226, 7 S.Ct. 552, 553, 30 L.Ed. 623 (1887) (facts supporting Article III jurisdiction must "appea[r] affirmatively from the record").

Finally, we note a different formulation of El Paso's "competitor standing" argument that appears at first blush more substantial. Although the claim does not emerge clearly, El Paso may have intended to argue that FERC's determination that petitioner must obtain a § 7 construction authorization before building facilities to serve the Mexican market, while the LDCs could proceed without satisfying § 7, placed El Paso at a competitive disadvantage.

The response already made to petitioner's "upstream transporter" argument, however, disposes of this potential ground for standing as well. By declining to apply § 7 to the LDCs, FERC did not effectively authorize the LDCs to serve the Mexican market. Rather, the Commission held only that the LDCs had approached the wrong regulatory body for authorization; any approval necessary for the LDCs to proceed with the Project Vecinos construction should have been sought from CPUC, not FERC. Again, on the record in this case, we are unable to say whether requiring the LDCs to seek CPUC, rather than FERC, authorization was a competitive advantage or disadvantage—the answer would turn on concrete differences between the regulatory schemes that El Paso has failed to elaborate.

## III.  CONCLUSION

Petitioner has not carried its burden to demonstrate that the challenged jurisdictional determination has caused or imminently will cause it injury in fact. We therefore dismiss the petition for lack of standing.

*So ordered.*